NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0340n.06

Nos. 19-1243/19-1667/19-1669

UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Jul 15, 2021 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| ZAFAR MEHMOOD, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: BATCHELDER, WHITE, and DONALD, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** We previously affirmed Defendant Zafar Mehmood's convictions for fraud, money laundering, and obstruction of justice, but we vacated his sentence and remanded for resentencing. On remand, the district court recalculated the loss amount attributable to Mehmood's fraudulent activity and sentenced him to a below-Guidelines term of imprisonment. In this appeal, Mehmood argues that the district court failed to follow our instructions on remand and erred in calculating the loss amount, which also resulted in an erroneous restitution determination. He further challenges the district court's denial of his motion for new trial based on newly discovered evidence. We AFFIRM.

**I.**

From 2006 to 2011, Mehmood and others ran a fraudulent scheme involving several home-health-care companies that purported to provide physical therapy to home-bound Medicare

beneficiaries and submitted fraudulent claims to Medicare.[1]  During the conspiracy, Mehmood's companies submitted $47,219,535.47 in Medicare claims for in-home care.  Medicare paid $40,488,106.98 on those claims.

A grand jury returned an indictment charging Mehmood with one count of conspiracy to commit health-care fraud, in violation of 18 U.S.C. § 1349; four counts of health-care fraud, in violation of 18 U.S.C. §§ 1347 and 2; one count of conspiracy to pay and receive health-care kickbacks, in violation of 18 U.S.C. § 371; one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and two counts of money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2.  A grand jury later returned a separate indictment charging Mehmood with two counts of obstruction of justice, in violation of 18 U.S.C. §§ 1512 and 2.  These latter charges stemmed from the government's contention that Mehmood took incriminating parts of patient files from the government's offices while he was there reviewing the evidence in preparation for trial.

At trial, numerous former employees of Mehmood's companies testified about the scheme's design and scope.  This included evidence that Mehmood and others paid bribes to recruiters for Medicare beneficiaries recruited or referred to his companies; recruiters offered and paid bribes, including prescriptions for controlled medications, for the beneficiaries' Medicare information and signatures on medical records; Mehmood and his employees created fake patient records with fabricated medical information; Mehmood taught his employees how to fabricate medical data to make it appear that the patient was making progress; Mehmood's companies submitted claims for beneficiaries who were deceased or hospitalized at the time of the alleged in-

---

[1] The companies listed in the indictment included Access Care Home Health Care, Inc. (Access), All State Home Health Care, Inc. (All State), Patient Care Home Care, Inc. (Patient), and Hands on Healing Home Care, Inc. (HOH).  Mehmood was the owner and president of Access, Patient, and All State, and co-owner of HOH.

home therapy; Mehmood, who was also a physical-therapist assistant, submitted bills showing that he provided services for multiple patients at the same time, sometimes in different cities; and Mehmood created shell companies and tasked intermediaries with facilitating payments.

A jury convicted Mehmood on all counts. The district court sentenced Mehmood to 360 months' imprisonment, based in part on its determination that the loss amount from Mehmood's fraud was the full amount of gross billings submitted by Mehmood's companies.

On appeal, we affirmed Mehmood's convictions but vacated his sentence. *United States v. Mehmood*, 742 F. App'x 928, 931 (6th Cir. 2018) (*Mehmood I*). As relevant here, we rejected Mehmood's sufficiency-of-the-evidence argument on the obstruction-of-justice counts:

> The government presented evidence that although Mehmood was detained pending trial he was granted temporary release from custody to accompany his attorneys to the office of the U.S. Department of Health and Human Services ("HHS") in Detroit to prepare for trial and review original patient records and other materials seized from Mehmood's companies. HHS discovered that certain incriminating, original pages were missing following Mehmood's three visits and law enforcement found these pages in Mehmood's cell upon executing a search warrant.

> At trial, the government presented evidence that the original patient files had been scanned by the government prior to Mehmood's examination of those files at HHS. The government argued: "we're able to take both what was left after Mehmood's visit [to HHS,][(Ex. 352)], as well as the documents that were seized from Mr. Mehmood's cell[, (Ex. 350A)], and if we put them together, they match exactly" to the scan of the original records produced before Mehmood's visit to HHS, (Ex. 351). (R. 322, PID 9340.) Specifically, the government focused on the file of Janie Drake, comparing a scanned version of the Drake file made before Mehmood's visit, to a version of the original Drake file scanned immediately after Mehmood's visit, (Ex. 352), to reveal the missing pages. The missing pages, (Ex. 350A), were later found in Mehmood's cell.

> Mehmood now seizes on the government's argument at trial that the pre- and post-HHS-visit scans "match[ed] exactly." (R. 322, PID 9340.) He argues that because the two scans contain certain dissimilarities, they do not "match exactly," and thus Exhibit 351 cannot be a reliable representation of the contents of the Drake file as originally seized. (Mehmood Br. at 34 ("In light of the dissimilarities . . . , the case agent's testimony that Exhibit 351 is a scanned duplicate of the original Drake file viewed by Mehmood at the HHS field office 'defies physical realities' and 'contradicts indisputable physical facts.'") (citing *United States v. Farley*, 2 F.3d 645, 652 (6th Cir. 1993)).) Stated differently, Mehmood argues that the

dissimilarities prove that "Exhibit 351 and Exhibit 352 . . . were not created from the same physical document," (Mehmood Reply Br. at 15), and thus Exhibit 351 "should be excluded from this Court's review of the sufficiency of the evidence." (Mehmood Br. at 34.)

Mehmood's argument fails. First, the complained-of dissimilarities are minute: stray pen marks, additional or misaligned punch holes, additional staple marks or staple marks in different locations, a speck of dust or stray piece of lint, or slight discoloration or stains. Mehmood identifies no substantive differences between the two scans. And the differences he does point to do not make Exhibit 351 inherently unreliable because the scans were made of the originals at different times and after they were reviewed and handled.

Second, Mehmood did not make this argument to the jury, did not explore the alleged dissimilarities at trial, and did not raise the issue in his motion for acquittal. He never argued, as he does now, that certain dissimilarities undermined the authenticity of the exhibit. Instead, he asks that we draw our own conclusions about the scans and "give no weight to this evidence because it is irreconcilable with the physical facts." (Mehmood Reply Br. at 10.) We decline to entertain Mehmood's argument about the alleged dissimilarities because "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, 2, 132 S.Ct. 2, 181 L.Ed.2d 311 (2011). "[T]he court cannot substitute its judgment of the evidence or the facts for that of the jury, since ascertaining the facts is within the exclusive province of the latter." 9B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2524 (4th ed.); *see also United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 588-89 (6th Cir. 1999).

Mehmood also points to other evidence he argues undermines his obstruction conviction, such as testimony that: (1) neither Mehmood's attorney nor the HHS agents saw Mehmood take any patient files from the HHS office; (2) "Medicaid providers may have legitimate business reasons to create multiple copies of a patient file"; and (3) Mehmood's attorneys had given him copies of patient records that he kept in his cell. (Mehmood Br. at 34-35.) But the jury heard this testimony and chose to give it little weight. Instead, the jury permissibly credited the testimony of the FBI agent who executed the search of Mehmood's cell and who testified that the pages recovered from Mehmood's cell were the missing *originals* because "the paper was indented as if being pressed by a point of . . . a pen," and because they contained an original, handwritten "sticky note" attached to the documents, as opposed to a photocopy of the note, and, thus, the recovered pages could not have been copies given to Mehmood by his attorneys or made at Mehmood's companies before his arrest. (R. 323, PID 9504-06; 9509-10.)

Thus, we conclude that the evidence was sufficient for the jury to find beyond a reasonable doubt that Mehmood attempted to obstruct justice by removing certain incriminating patient files from HHS.

*Mehmood I*, 742 F. App'x at 936-38 (alterations in original) (footnotes omitted).

We concluded, however, that Mehmood's sentence must be vacated, in part because the district court erred in its analysis of the loss amount.[2]  In particular, we found that the district court erred in reasoning that the loss amount consisted of "the full amount of gross billings submitted by Mehmood's companies between 2006 and 2011—$47,219,535.47—because Mehmood obtained access to the Medicare program by certifying that he would not engage in kickbacks 'without any intention of living up to' that promise." *Id.* at 940 (citation omitted).  Rather, because "the Guidelines state [that] 'the aggregate dollar amount of *fraudulent* bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss,'" the district court should have deducted "the value of any *legitimate* claims, if established." *Id.* (quoting U.S.S.G. § 2B1.1, cmt. n.3(F)(viii)).  And we noted that Mehmood had introduced evidence that legitimate medical services were provided to some patients, which the district court did not address. *Id.*

On remand, before resentencing, Mehmood moved for a new trial on the obstruction counts based on a claim of newly discovered evidence.  He argued that the new evidence, consisting of two forensic examination reports, showed that trial Exhibits 350A (the missing pages from the Drake file that were found in Mehmood's cell) and 352 (the pages from the Drake file remaining after Mehmood's review of the files) were not derived from the same source document as Exhibit 351 (a scan of the original file produced to Mehmood prior to his review of the file at the government office), undermining the verdict.  He also argued that his computer expert should be granted access to the scanner used to create the scan of Exhibit 351.  At a hearing on the motion, Mehmood requested that he be allowed to call witnesses in support of his motion.  After

---

[2] We also concluded that the district court erroneously applied two separate enhancements for obstruction of justice, and remanded for further consideration of the separate enhancements for sophisticated laundering and sophisticated means. *Mehmood I*, 742 F. App'x at 941, 943.  These issues are not raised in this appeal.

questioning counsel, the district court declined to allow the witnesses, concluding that Mehmood was not entitled to a new trial because the proffered evidence was not newly discovered and could have been discovered earlier with due diligence. The district court entered a written order to that effect denying the motion.

The district court also conducted two resentencing hearings where Mehmood called additional witnesses. These witnesses generally testified that they observed no fraud while working for Mehmood's companies, and some of them had been present when medical services were provided to patients. The government presented no additional evidence, choosing to rely on the evidence submitted at trial. It argued that because the fraud was pervasive, the district court should begin with the amount Mehmood's companies billed to Medicare, and then deduct any legitimate services that Mehmood could establish. Mehmood argued that aside from a handful of patients, the government had not met its burden to establish that the Medicare bills were fraudulent. He advocated for a finding that only fifteen percent of the billings were fraudulent, and argued that a contrary approach would run afoul of our mandate.

The district court agreed that the evidence supported the government's position that fraud was pervasive, and it therefore considered the more than $47 million billed to Medicare as the intended loss. It asked Mehmood several times if he could point to specific claims that were legitimate, but Mehmood declined to do so, saying it was not his burden. Based on testimony that some of the services were legitimate, and to be conservative, the district court reduced the loss amount for the claims submitted by the four companies listed in the indictment—Access, Patient, All State, and HOH—by twenty percent. This alone resulted in a loss amount of $26,176,405,[3] corresponding to a twenty-two-level enhancement under U.S.S.G. § 2B1.1(b)(1)(L). After

---

[3] The district court also added over $14 million to that number related to billings from other companies, which the district court found were entirely fraudulent. Mehmood does not address this finding.

determining the applicability of other enhancements not relevant to this appeal, the district court found that Mehmood's total offense level was forty-two, yielding a Guidelines range of 360 months to life. The district court varied downward and sentenced Mehmood to 300 months' imprisonment: 240 months on the fraud and money-laundering counts, followed by sixty months on the obstruction counts. The district court also ordered restitution in the amount of $20,792,548.

This timely appeal followed.

## II.

## A.

Mehmood argues that his sentence is procedurally unreasonable because the district court again erroneously calculated the loss amount and therefore miscalculated his Guidelines range. We review challenges to the procedural reasonableness of a sentence for an abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). We review de novo the district court's methodology for calculating loss, and its factual findings—determined by a preponderance of the evidence—for clear error. *United States v. Ramer*, 883 F.3d 659, 687 (6th Cir. 2018).

A defendant's offense level is adjusted based on the amount of loss the district court determines is involved in the offense. U.S.S.G. § 2B1.1(b)(1). As relevant here, for a loss that is more than $25,000,000 but less than or equal to $65,000,000, the base offense level is increased by twenty-two levels. *Id.* § 2B1.1(b)(1)(L). "The relevant amount of loss for a Section 2B1.1 enhancement is the greater of the actual loss, defined as the reasonably foreseeable pecuniary harm that resulted from the offense, or the intended loss to the victim. The district court's duty is to make a reasonable estimate of the loss." *United States v. Washington*, 715 F.3d 975, 984 (6th Cir. 2013) (citing U.S.S.G. § 2B1.1 cmt. n.3(A), (C)).

> In a case in which the defendant is convicted of a Federal health care offense involving a Government health care program, the aggregate dollar amount of

> fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss, i.e., is evidence sufficient to establish the amount of the intended loss, if not rebutted.

U.S.S.G. § 2B1.1, cmt. n.3(F)(viii).

Mehmood challenges the district court's methodology and its findings of fact. Regarding the methodology, Mehmood first argues that the district court contravened our opinion in *Mehmood I* by using the gross billings as its starting point and putting the onus on him to disprove the bills' fraudulent nature. According to Mehmood, our prior opinion required the government to prove which specific claims submitted to Medicare were fraudulent.

We disagree. We vacated the district court's prior loss determination because it appeared to rely on the unsupported theory that none of Mehmood's claims were legitimate due to his initial certification to Medicare that he would not engage in kickbacks. 742 F. App'x at 936-38. We explained that the district court must deduct the value of any legitimate claims, "if established," and noted that there was evidence that Mehmood's companies may have performed at least some legitimate services that the district court did not sufficiently address. *Id.* On remand, the district court expressly disclaimed the theory we rejected, but it still determined that the full amount of gross billings to Medicare constituted prima facie evidence of the aggregate dollar amount of the fraudulent bills given the overarching fraudulent purpose—and convincing evidence about the consistent fraudulent execution—of the scheme. It also evaluated the testimony tending to suggest that at least some of the services performed were legitimate. Accordingly, the district court complied with our mandate.

Nor do we find any error in the district court's approach. The district court reviewed the trial evidence in detail and exhaustively explained its conclusion that "the overwhelming testimony that we have that the purpose of these home healthcare agencies was fraudulent from the beginning,

and it was beautifully executed over an extended period of time, until the [government] raided the operation." R. 423, PID 12344; *see also id.* at PID 12352-53 (finding that Access, Patient, All State, and HOH "were formed for the sole purpose of carrying out this fraud"); *id.* at PID 12366-67 (concluding that one company not listed in the indictment, My Home Doctor, "was a completely fraudulent outfit," and that three other companies were shell corporations used to pay recruiters and did not provide any patient services). This review included witnesses' testimony, credited by the district court, that fictitious patient charts were created; patients did not receive the care listed in the bills and either did not want or did not need the care; bribes were routinely paid to patients and doctors; and many patients purportedly needing homecare were signed up based solely on their Medicare eligibility at an office building in Detroit or another location requiring the patients to climb a flight of stairs (thus suggesting that these patients were not truly homebound). These witnesses did not describe one-time events, but rather pervasive practices.

We have found that the value of all submitted bills satisfies the government's burden to present prima facie evidence of the intended loss where the defendant's companies were "entirely a fraud," *United States v. Meda*, 812 F.3d 502, 520 (6th Cir. 2015), "the entire [] program was a sham," *United States v. Washington*, 715 F.3d 975, 985 (6th Cir. 2013), or a defendant "engaged in a pervasive health care fraud conspiracy," *United States v. Lovett*, 764 F. App'x 450, 460 (6th Cir. 2019). In these situations, once the government meets its burden by establishing the pervasiveness of the fraud, it is up to the defendant to "prov[e] the specific value by which that amount should be reduced." *Washington*, 715 F.3d at 985; *see also United States v. Mahmud*, 541 F. App'x 630, 636 (6th Cir. 2013) ("Mahmud argues that the loss calculation should have been based only on payments to companies that the government proved were engaged in fraud and that the legitimate services he billed to Medicare should not have been included in the loss calculation.

While Mahmud is correct that he should not be punished for services he actually rendered, U.S.S.G. § 2B1.1 cmt. 3(E), once the Government met its burden to prove the total amount, it was his burden to prove 'the specific value' by which the loss amount should have been reduced." (internal citation omitted)); *accord United States v. St. John*, 625 F. App'x 661, 668 (5th Cir. 2015) ("[W]here the fraud is so pervasive that separating legitimate from fraudulent conduct 'is not reasonably practicable, the burden shifts to the defendant' to prove any legitimate amounts." (quoting *United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012))). Here, the district court reviewed the trial testimony and explained its conclusions that Mehmood's companies were fraudulent at the outset and that the fraud was pervasive and continued until the government intervened. It found, consistent with our precedent, that the government therefore met its burden to establish prima facie evidence of the amount of loss. Thus, we find no merit to Mehmood's contention that the district court improperly shifted the burden of proof to him.

Mehmood also appears to argue that the evidence was insufficient to find that the fraud continued until the time his offices were raided. He points out that none of the witnesses at trial worked at Mehmood's companies after 2008,[4] and yet the district court used the claims submitted by Mehmood's companies until 2011. However, there was extensive evidence detailing the fraudulent nature of every aspect of the scheme, supporting the district court's finding that these companies were fraudulent from the outset and continuously operated in a fraudulent manner. Further, as we noted in *Mehmood I*,

> the evidence seized during the search of Mehmood's businesses on November 3, 2011, suggests that the conspiracy continued until Mehmood's arrest. For example, photographs of Mehmood's offices taken during the search on November 3, 2011 show that Mehmood continued to employ the same means to avoid detection. In any event, Mehmood does not challenge the sufficiency of the evidence of his health-care-conspiracy conviction and he did not present any evidence at trial that

---

[4] The government also introduced statements made by co-defendant Badar Ahmadani, who withdrew as owner from HOH in June 2009.

he had withdrawn from the conspiracy, despite having the burden to establish this defense.

742 F. App'x at 943 n.16. The district court relied on similar evidence, finding credible the agent's testimony explaining the photographs of the office, and concluding that "nothing in this office [] indicates these entities were engaged in the legitimate business of healthcare services." R. 417, PID 12254. The photographs showed the names of all the home-health agencies on a white board and their approved dates to bill Medicare, and phones lined up next to each other with a sticker on the phone to help whoever answered the phone to identify the correct company. As the government argued, "what this shows is simply the menu of home health agencies that Mr. Mehmood could select from at one time in order to bill Medicare." *Id.* at PID 12196. Given this evidence, the district court did not clearly err in finding by a preponderance of the evidence that Mehmood continued to carry out the fraud through November 2011.

Once the district court made its determination about the intended loss amount, it was Mehmood's burden to establish the amount of legitimate billings to deduct from the total. *See, e.g.*, *Washington*, 715 F.3d at 985. The district court allowed Mehmood to call seven additional witnesses during the two resentencing hearings. It considered their testimony, along with the defense witnesses' testimony at trial, in determining the amount to deduct as legitimate billings. It found that some witnesses were not credible, a finding not challenged on appeal. Although the district found other witnesses credible, it explained that some of the witnesses had roles in the company (such as a driver or file clerk) that did not allow them to know whether a fraud was being carried out. However, because some witnesses testified to providing care to patients, the district court concluded that some deduction was warranted. Even though Mehmood made no effort to quantify the amount of legitimate services provided based on those witnesses' testimony, the district court deducted millions of dollars from the loss amount by determining that only eighty

percent of the claims submitted by Access, Patient, All State, and HOH were fraudulent. It based this determination on testimony from two witnesses who provided care to patients and Mehmood's argument that "if there's one good apple, there are likely to be more good apples nearby." R. 423, PID 12364. It also used as a benchmark the testimony from two other witnesses who learned the fraudulent business from Mehmood and went on to form their own fraudulent businesses where eighty to ninety percent of the business was fraudulent. We find no error in the district court's conclusion that this determination "g[a]ve the benefit of the doubt to the defendant's calculation." *Id.* at PID 12365.

Mehmood does not meaningfully argue that the evidence supported a further reduction. Instead, he primarily argues that the district court improperly placed the burden on him to establish the value of legitimate services. Because we have rejected that argument, we affirm the district court's loss determination. Mehmood also challenges the restitution order, but on the same grounds as his challenge to the loss amount. And for the same reasons, we affirm the district court's restitution order. We accordingly affirm Mehmood's sentence.

**B.**

Next, Mehmood challenges the denial of his motion for new trial, which we review for abuse of discretion. *United States v. Sypher*, 684 F.3d 622, 626 (6th Cir. 2012). Mehmood's motion was premised on his claim of newly discovered evidence. To prevail on such a motion, Mehmood must establish "that the evidence (1) was discovered only after trial, (2) could not have been discovered earlier with due diligence, (3) is material and not merely cumulative or impeaching, and (4) would likely produce an acquittal if the case were retried." *United States v. Dubrule*, 822 F.3d 866, 885 (6th Cir. 2016) (internal quotation mark omitted) (quoting *United States v. Garland*, 991 F.2d 328, 335 (6th Cir. 1993)). "Motions for a new trial based upon newly

discovered evidence are disfavored and should be granted with caution." *United States v. Turns*, 198 F.3d 584, 586 (6th Cir. 2000) (citing *United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991)).

The evidence here does not qualify as newly discovered evidence that could not have been discovered earlier with due diligence. Mehmood submitted reports from two experts analyzing evidence that Mehmood possessed before trial supporting an argument that he made, and we rejected, in the prior appeal. One report compared Exhibit 351, the original scan of the complete Drake file, to Exhibit 350A, the pages from that file recovered from Mehmood's cell; and the other compared Exhibit 351 to Exhibit 352, the remaining pages in the Drake file after Mehmood's visits to the government offices. Both reports concluded that there were significant differences between some of the document images from each exhibit.

Mehmood concedes that "there was nothing preventing [the exhibits'] examination at or before trial." Appellant's Br. at 29-30. This would seem to foreclose his argument that the evidence is newly discovered, but he nevertheless argues that "the documents were not called into question until [his prior counsel's] disclosure and production of the pictures, which only occurred after trial and right before the original sentencing proceedings. The district court did not consider this in dismissing Mehmood's new trial motion." *Id.* at 30. Although Mehmood faults the district court for not considering the photographs his former counsel apparently discovered after trial, Mehmood never made this argument in his new-trial motion.

The photographs, which are not in the record, do not aid Mehmood in any event. The photographs he refers to were first discussed in a motion to adjourn sentencing that Mehmood filed after his trial but before his initial sentencing and appeal. The motion stated:

> In late 2014, counsel visited Defendant's former office and took digital photographs, including of several documents which appeared to be from patient

> files, with a camera. Months later, when counsel looked for the digital photographs, he was unable to find the memory card on which they were stored.
>
> Recently, at Defendant's request, counsel again searched for the photos and found them. Defendant compared them to the documents which were seized from his jail cell at Dickerson, and discovered that the photos of four documents were copies of documents seized from his cell. After being advised of that, counsel returned to the office and located the three binders in which the photographed documents were present.

R. 273, PID 5112-13. Even accepting the statements made in the motion as true, it is apparent that the photographs and documents were in Mehmood's counsel's possession well before trial. And even if misplacing evidence and finding it later can make evidence newly discovered, Mehmood's counsel was apparently able to find the evidence by "again search[ing] for the photos," and thus the evidence could have been rediscovered earlier with due diligence.

In his reply brief, Mehmood shifts his focus to the metadata for the scanner used to scan the patient file. *See* Reply Br. at 3 ("[T]he key evidence – the metadata, was not [available to the defense before trial."). Mehmood's theory about how the metadata might have resulted in an acquittal is not sufficiently explained, but the metadata for the scanner used to scan the patient file existed well before trial. The time to litigate whether Mehmood could access the metadata was before his trial and conviction. Waiting until after conviction to seek a court order for the government to produce evidence that existed long before does not make that evidence newly discovered.

Because we agree with the district court that the forensic reports and metadata do not constitute newly discovered evidence that could not have been discovered earlier with due diligence, we find no abuse of discretion in the district court's refusal to hear testimony addressing the substance of that evidence. *See United States v. Smith*, 749 F.3d 465, 493 (6th Cir. 2014).

### III.

For the reasons set forth above, we affirm.